of the day, which is Modern Mosaic v. Turner Construction Company. We'll hear from the appellants. Good morning, Justice Wynn, Justices of the Court. My name is Ed Sheets. I'm here from Syracuse, New York. Don't elevate us, we're judges. Well, it could happen. I appreciate the courts providing me the opportunity to appear before you and argue today. I also would like to note a thank you to our local counsel, Jeff Van Valkenburgh. He has been a true yeoman in helping us navigate the courts in West Virginia and here as well, and I appreciate Jeff's help to the firm. There's a large record. I'm going to try to make it a short argument, and I'm going to try not to even move, if I can, into the yellow light that's in front of me. There's a troubled project in Clarksburg, West Virginia, I believe a project that may well have been before this court before, and we represent the subcontractor from Ontario, whose job was to manufacture, deliver, and install precast concrete panels or exterior cladding, veneer on, you see when you look at many, many structures. Not to be confused with flat work, which was something we'll get to in a little while with regard to the trial court's decision. Your client makes three claims here, three claims here, and some money for some things that you say they're entitled to. Unlike those before us who dealt with liberty, this is money, and there are three claims, Your Honor, yes. There are the three claims, which I'll discuss in this order, involve additional costs because of an apparently failed construction by a previous contractor of a parking garage, followed by a claim involving precast concrete that was set on a landscape, and then a third claim involving what's been called supervisory surveillance. Now, that first claim, this was phase two of a project, a large project, and the general contractor was Turner. Phase one was constructed by another company called Mascaro, which performed the structure of that parking garage. Then the job passed off to Turner for phase two. During the course of the project, problems were encountered that were not obvious to the eye when Modern went to erect the precast concrete that it built to put on the sides of the building. The building was out of plumb. Things didn't fit on certain portions of the building. Now, the trial court, in what I refer to as the flatwork error, overlooked a number of things. This particular claim, just under a million dollars, was disposed of by summary judgment, and there are things in construction which this contract between Turner and the owner, the U.S. government, clearly precast upon Turner. You have to set control lines. How does the flow-down provision not obligate you for the obligations that under the prime contract were Turner's? That can be addressed in several ways, the first of which is in the absence of something,  I mean, I'm just trying to get to the plain language of the flow-down and how that doesn't dispose of any of the Turner obligations in the prime contract. I mean, why is that not case based on just the black and white words that your client agreed to? In several ways. What is missing from the defendant's affidavits, many of them, is any mention that Modern Mosaic had the responsibility to perform any structural engineering or engineering services. But why does it matter that there be affidavits? I mean, why, I thought, I mean, their argument is that the contract is what governs, and the contract under the flow-down provision says that obligations of Turner to the FBI flow down to you. So what's affidavits have to do with it? If that were the case, Your Honor, in the extreme, then it would be Modern's job to for the project, including that subbed out to other subcontractors by Turner. But the law doesn't look at a flow-down clause in that fashion. The flow-down clause is, okay, precaster, you need to do the things that are necessary to do your work. In fact, the general contract between the government and Turner casts specifically upon Turner the responsibility for engineering, which, again, Turner doesn't say we had to perform, carefully study the existing building, verify the field dimensions, provide engineering and surveying, and to ascertain if this building was ready for their subcontractors, all of them, not just one, to come and perform their work. And that's where Turner failed, and that's a responsibility that is retained by Turner. It's not specifically delegated out as an engineering responsibility to Modern Mosaic anywhere in the contract. So a flow-down clause does not mean the entire ocean goes through. It means things involving the window contractor, the flat work or horizontal concrete contractor, the roof, what have you. Your scope of work, you have to make sure you can do your scope of work, not his, not his, and certainly not the whole project. But that's what Turner hides behind. And the trial court on... It would be helpful, at least as someone like me in terms of trying to understand in the simplest way, tell us which one of these claims you're referring to. Each one has kind of a different argument. This is the parking garage claim? Field verification business and that sort of thing. And the control lines, yes, sir. The claimant is just under a million dollars. I'm taking them in that order. And the trial court hinges on something that really kind of comes with respect out of the blue toward the end of the court's opinion. The trial court passes by Turner's responsibilities as a general contractor, which it seems to try to say we have none. And basically the trial court says, yeah, Turner has no responsibility. But then the court makes this hinge, what I call the flat work error. And it's in the record, it's at record 708, where the trial court is going along having a discussion and then pulls out of the blue another part of the contract that deals with flat work. And the trial court then seems to say, well, since precast concrete is flat, it applies to the precast contractor. Although I suppose it would apply to window contract as well, because those are flat. And the trial court even admits in its decision, we don't know what flat work means. And the trial court's decision- May I interrupt you just to clarify? Yes, ma'am. I'm under the impression that there were five different provisions of the contract that the court pointed to when it came to the responsibility for field verification of these panels that were going to go in the parking garage. So there's not just one provision, and it's not even just the ones that are subject to the flow down. There's Article 11 and Article 12 that the court pointed to as well. So do you have to prove that you weren't responsible under all of those provisions? I believe your point, Judge Rushing, is Judge Claudelbaum's point at the bottom line, and that is what flows down. We had to perform the work necessary to make sure we could do our work. But when there's a flaw in the overall structure, which goes beyond the scope of work of this single contractor, that rests with the responsibilities of a general contractor. Article 11 says you'll ensure proper matching and fitting of the work with contiguous work. So you have to make sure that what you build is going to fit with what's already there, even if what's already there isn't plumb. Am I reading that correctly? It means that that subcontractor's work will be attached to the structure and will line up with itself. Excuse me, that the panels will line up with themselves. It doesn't mean that the subcontractor or any of them. I mean, this is boilerplate language. Turner would then say to you, Your Honor, that the window contractor, if there were windows, the flat work contractor, anybody else also had the job to do Turner's job. And it's not as broad as that. The flow down clause means this contractor has to do its work properly. If you even look back... That's not in the flow. I mean, Judge Rushing's point was that's not in the flow down. That's in the contract that that's your express responsibility under the subcontract. So there's a flow down that we could maybe debate. But then Article 11, which Judge Rushing just talked about, imposes some direct responsibilities on you. And Article 13 does as well. So I think flow down is one issue. And then there's your direct contractual responsibilities. And so don't you have to get around both of those, number one? And then my second question is you use boilerplate provisions. Well, I mean, you may not be as big as Turner, but you're a commercial entity. Are you trying to say that the provisions of your contract aren't applicable to you because they're boilerplate? Oh, no, no, no. I would never say that, Your Honor. I'm saying they apply to the precast contractor for the precast contractor's work, not for the overall project. I don't believe there's anything in the subcontract that takes away from Turner or delegates specifically to this contractor that type of an engineering responsibility. Turner doesn't make that claim in any of its affidavits. Turner retained that responsibility to make sure the building was ready for its subs. My point with regard to the flatwork error is that the that has its pivotal point toward the end of its discussion while admitting that it doesn't know what flatwork is and then making a logic leap without any citation to the record or to authority or to any affidavits that this was a flatwork contract, which it wasn't, and that it therefore somehow applies. I've made it to the orange light, and I had hoped to avoid that. But this is worthy of discussion. And I would like to point out before I, if I may please, before I move to the longest argument I knew that. The trial court points out that Modern Mosaic, like a subcontractor to Turner, its claims that it makes, Turner will present to the owner. Turner presented this claim to the owner. It's not disputed. It's in Turner's claim letter and presentation, which are in the and gave Modern Mosaic nothing. Now, we brought this to the court's attention. It's all in the record. It's in Mr. Forlins' affidavits. It's in my affidavit as well. But Turner presented this claim with its other claims to the construction owner. Turner settles for just under $24 million and then says, we're done. They never, whenever Turner settled with the government, they deliberately did not have that settlement articulate who their subcontractors were who were going to get the money. Where's the obligation in the contract for them to do that? That obligation is in the subcontract and it is at, I can find it for you very quickly. I think it's Article 33 is the dispute resolution provision. Is that what you're? It's in the dispute resolution provision. And it says they're supposed to itemize the subcontractors involved? It doesn't specifically say itemize, I don't believe. But how else can you read this situation? When I go to the government of the United States and I take $24 million and I'm a general contractor that has subcontracted out nearly all of the work, then don't I at a minimum owe an obligation? And I'm going to go back to the old law school simplicity of good faith and fair dealing. Uncle Sam gives me $24 million. You want $1 million of it. I don't have to do anything. There's something more afoot here with the way Turner has behaved. That is a very deceptive thing. That is a very clear demonstration of bad faith to draw $24 million out of the government's coffers and then completely turn its back on its subcontractors, shrug and walk away. We brought that to the trial court's attention. It didn't seem to be of an interest in the issue at all. That is something that rises above flow-down clauses, in my humble opinion, and the other issues that you're going to hear about. That is something that is a much greater issue that this court ought not to approve or Turner, most certainly, and other general contractors as well, will rely upon your authority to say, we can do this whenever we want to. But as I understand the law of good faith and fair dealing, and I may have this wrong on a state basis, but generally the obligations of good faith and fair dealing can't be in conflict with express provisions of contracts. And in the dispute resolution provision, it says the subcontractor agrees that any decisions and determinations of the contracting officer shall be binding upon the subcontractor as the contractor. Doesn't that language make your position about how results of mediation or settlements, doesn't it make it dependent on either the contractor or the FBI? Well, two points in response, if I may. One is, it also imposes upon Turner an obligation to say to the FBI, whose claims are you paying in our $24 million settlement? But in the first instance, it doesn't create that conflict. How could it create that conflict? Is the court saying that Turner can present tens of millions of dollars of subcontractor claims to the government, get paid for $24 million of them, then completely turn its back on all those subcontractors and walk away and pocket the money? Some would call that larceny. To me, that is not in conflict. That is an issue of good faith and fair dealing that the trial court didn't even shrug at, but it's in this record. I will loop into one other argument, with your permission, very quickly, and that is the claim referred to as the landscaping claim for the manufacture and install of landscaping pieces throughout the grounds. In that claim, in ruling on that claim, the trial court refers to the same concept and says, well, you get aware that your time is up, but if you want to extend it until your rebuttal time is up to you. I will, with your permission, ask that I may do that, and I'll continue and I'll give the rebuttal at my risk. The trial court seizes upon this issue about what Turner gets from the government, and that's how the trial court paid Modern Mosaic a part of its claim resulting from failed soils, but then the trial court's not interested in how it applies to the briefly on that landscape claim. The soils were bad. Modern Mosaic went to a great deal of cost to come and go, come and go, wait and come and go, to fix and reinstall precast because the soils were bad. Modern presented a claim. It did not call it a delay claim. The word delay is not used in any of Modern's change order paperwork. Isn't this a factual finding by the district court about which costs were for delay and which costs were for extra work? That's a pretty high standard of review for us. I agree, but I also would point out, Your Honor, that the district court at 1960 cites to a clause that's an insurance clause that says that if the general contractor has a claim, it'll make a claim and it'll pay, and if the subcontractor gets money, it gets money, but nothing in there says that the subcontractor waives or relinquishes any claims that the insurance company pays. Nothing in that clause says... You agree it's a factual finding which costs were for delay and which ones were for extra work? That would be a factual finding. Thank you. Along with the point, however, Your Honor, that all of the documents that follow that claim are for work, erection, and storage, not delay costs, and the word delay isn't mentioned in Modern's claim. It's not. You dispute the factual finding. Absolutely, Your Honor. Of course. Just to the point, on this claim, the trial court said you're stuck with what happens above. On the first claim, the trial court ignored that issue completely, and that first claim was the undismissed on summary judgment. For the soil failure claim, the trial court's decision in interpreting a contract clause as a complete waiver and relinquishment clause when it does not contain either word or even the concept, that's at record 1960, was very much an error. There is also the claim for the supervisory surveillance which is out there. I would, without waiving that claim, I would refer to the record in our briefs on that issue. Are there other questions that I can address to this court? Thank you again for the opportunity. You may have a minute. The clerk will let us know for rebuttal. We'll hear from the appellee. And I'd like to say that, Mr. Patton, please go up there. It's wrong on the sheet. It has them opposite to second and third. Thank you. May it please the court, Douglas Patton for Turner. I'd like to address a statement counsel made in argument that the court in its summary judgment decision on the parking garage claim ignored the argument that Turner recovered a certain amount of money and therefore reached its implied duty of fairness and estoppel should be applied. What counsel does not tell you is that argument was made in a brief filed on April 18th, 2017 after the court issued its summary judgment decision on March 17th, 2017. And counsel wonders, well, why didn't the court address this issue in the summary judgment decision? And the simple answer is you didn't raise that issue in your opposition to the motion for summary judgment. In fact, I challenge counsel to point to the word estoppel anywhere in its brief at JA 272 to 287. So to me, this is an extraordinary misapplication of a very basic rule this court follows. Yes, we have the novel a review of summary judgment motions to issues properly preserved below. And I think it's extraordinary that counsel is criticizing Judge Stamp for failing to address an argument in his summary judgment opinion that was raised to him on two different claims in a brief filed one month after he issued his decision. Can I ask you a question that relates to the surveillance claim? Yes, sir. And as I understand it, part of your argument and part of the decision below was that the resolution of that claim hints somewhat on the intent or the decision of the FBI. And what the FBI under I think Article 14 says essentially governs. Is that right? That's correct. And the reason I ask that is Article 14 seems to say that's the case for plans and specifications. Is this an issue of plans and specifications? A surveillance is an issue of whether or not the work is being installed properly pursuant to the plans and specifications. That's why the contract subcontract specifically paid them to have somebody survey the work. And that's why the prime contract required it as well. I guess, I mean, again, it looked to me like that applied to disputes over what the plans and specs say, but not what the actual contract terms are. And it looks like this dispute over the contract terms. And so I'm wondering whether, let me just ask it this way. Let's assume I think Article 14 applies to disputes about the plans and specs and not about the contract terms. What is your other argument as to why you prevail on the surveillance claim? The other argument is the plain language in the contract. And let me just get to that for you. You're talking about the prime contract? Or the subcontract? I believe it's covered in the subcontract. Let me just get there quickly, please. Okay. Paragraph 3.8, and this is covered at record 1948 in Judge Stamp's opinion. Paragraph what? Part 3.8, paragraph 22 at 1948. Okay. Which Judge Stamp rationalized as follows. Paragraph 3.8 of the prime contract required Modern, through the flow-down clause, to, quote, erect units under supervisory surveillance of a professional engineer or licensed land surveyor. That's a specific clause that says you shall erect under supervisory surveillance. It doesn't say you can have supervisory surveillance two days a week, three days a week. The clear language is if you're erecting units, it's got to be under supervisory surveillance. And that's a separate from a part from the Article 14 language in the subcontract that you referred to, Judge. Thank you. So that's an independent reason why Judge Stamp's opinion on the contract interpretation for the surveillance is correct. I want to briefly summarize the parking garage issues, which involved the $975,000 claimed by Modern. There are five separate subcontract clauses. Five subcontract clauses that specifically, this isn't a delegation. Article 11 subcontract clause says the sub shall take such measurements to ensure proper matching and fitting. Article 13, subcontractors shall carefully examine such other work, determine whether it is fit, ready, and suitable. Paragraph 12 of AP-1, sub shall verify and accept existing conditions in accordance with the contract documents. Paragraph 26 AP-5, sub is responsible for taking field measurements as may be necessary. And paragraph 26 again, the subcontractor shop drawings shall certify they've carefully reviewed the submittal and verified it against field conditions. This isn't some delegated requirement from the prime contract. This is a specific obligation imposed upon Modern, because Modern's the one manufacturing these panels. Modern says somehow that's unfair that you make us go out there, field verify to make sure that what we manufacture is going to fit. Well, that's what the subcontract said. They didn't change those terms and conditions, and there's nothing unfair about that. Now, this argument that somehow Judge Stamp incorrectly interpreted Flatwork Contractor is a gross misstatement of the record. Look at JA-708, where Judge Stamp interprets the reference to Flatwork Contractor at AP-5. He reads the simple language that indicate that the Flatwork Contractor is some third party. It's not Modern. He doesn't say the Flatwork Contractor is Modern, as Modern argues in its brief. He says that the clause says the building each trade contractor will be responsible for providing their own layout and control, which simply means, okay, a third party may also provide controls, but you as a trade contractor have an obligation to provide your own. That's a gross mischaracterization of what Judge Stamp does. And there is no dispute that the contract says when you get shop drawings, revise and resubmit, you're not allowed to fabricate. But that's what they did. And Judge Stamp said that's a breach of the contract. And there's a clear contract clause that says you got to field verify before you manufacture. But they went ahead and manufactured corner panels, knowing the measurements were off and provided. But they just went ahead and did it. So the summary judgment opinion, we believe Judge Stamp wrote a very logical, reasonable, well thought out opinion. Now let's talk about the two other claims, which were covered in a separate opinion, where the parties agreed they would submit affidavits and documents, and the judge would make findings of fact and conclusions of law. We've already covered the surveillance claim. And I think the contract interpretation that we provide, that Judge Stamp provide, is clear and reasonable. There's a separate requirement through the flow down clause that you need to have supervisory surveillance while you're erecting. There's no limitation on the time for while you're erecting. And the interpretation of Article 14 of the subcontract that you have to do it according to the owner's approval is also reasonable. Now, the second element of that decision involves what's called soil remediation. And I have a particular problem with what they have done in this case again, which is, they say, Judge Stamp got it all wrong. Look at the catch the go decision, because the policy under the Miller Act is that a no damages for delay clause is not enforceable. That's the Miller Act policy argument, which they never raised below to Judge Stamp. They're asking you to say, Judge Stamp, you didn't get it right. You didn't interpret the Miller Act. It wasn't a delay. Well, that's another fact. Pardon me? They didn't say delay. Judge Stamp said it is a delay claim. He made findings of fact that it was a delay claim. And those findings of fact cannot be overturned unless they're clearly erroneous. That's the standard that applies in this case. And they have not demonstrated to you that claims for storage cost, claims for delayed work is not a delay claim. It is a delay claim. Those four findings he made and which they have failed to demonstrate are clearly erroneous. Is it correct that as a matter of the record, with respect to the soil remediation claim, that the additional work has been paid and what wasn't paid was the storage cost? Did I read it? Is that correct? That is correct, Judge. The issue is there was a variety of things related to the prior soil remediation. Some were paid. The ones that weren't paid was the storage. And I think, is it your position that that's a factual issue about whether it was or was not a delay? That's correct. Judge Stamp went through detail about the parts of this issue that were paid by Turner to Modern. Now, I want to quote to you their brief that Judge Stamp, a no damage for delay clause is addressed pursuant to the law of the state, JA 744. No Miller Act argument. All the cases that the Kitchens to Go relied upon, 9th Circuit Walton 2002, 1957, USV Carter case. All those policy arguments were available to Modern, which they never raised. In fact, they cite Judge Stamp's Kojak opinion. They don't say you got it wrong. They say inequities and foul play is an exception. And therefore, you should have not applied the no damages for delay clause. They never raise Miller Act policy arguments. And they go on to say, the court should find that the no damage for delay clause is against the general policy of the Miller Act and only enforceable if the delay was not caused by actions of Turner, JA 745. That's exactly the finding of fact Judge Stamp made. This wasn't caused by Turner. It was caused by an excavation subcontractor. Those findings of fact are not disputed. Next paragraph at 745, they cite Judge Stamp's Kojak opinion and says, yes, the court has enforced the no damages for delay clause, similar to the one in this contract. They don't say you got it wrong, Judge. You should not have enforced that clause because there's a policy under the Miller Act against it. But they say what's different is, quote, here inequities and foul play exist. Judge Stamp made findings of fact. There weren't any such inequities and foul play. And there is no basis to overturn his opinion on that basis. Judge Stamp wrote two very thoughtful opinions, carefully signing the record. We strenuously object to Martin coming in and raising arguments they didn't raise before the Judge Stamp. We think it's completely unfair and contrary to the jurisprudence of this court  on legal arguments not raised before him. Thank you. Thank you, counsel. Pro counsel has a minute or two. Good morning, your honors. My name is David Griffith. And I represent the sureties. I will be very brief because I only have three minutes. But I come before you today simply to reiterate the point that my co-counsel made, that the Miller Act policy issue raised by Modern for the first time in this appeal is a very important issue for the surety industry. The surety's never had a chance to brief or argue the policy issue below because it simply wasn't raised. As co-counsel stated, counsel for Modern below cited the Kojok opinion to Judge Stamp. And an interesting factual issue is that my clients, particularly travelers, the surety was a party to the Kojok decision. And would have expected that had that issue been raised, it would have been decided exactly as Judge Stamp decided it in Kojok. So we simply come before you today as a surety's obligation to pay under the bond is the same as the prime contractors. We basically stand in their shoes and therefore join in and concur with all of the arguments that have been raised by Turner. And would simply ask that you affirm Judge Stamp's opinion or decisions on all of the claims and particularly with respect to the soil remediation claim. Thank you, counsel. Thank you. Mr. Sheets, you probably use that most of the time, but come on up and give us a few moments of rebuttal. I appreciate the opportunity, Judge, and I'll be very brief. Simply to note that with regard to the issue of estoppel, I would refer the court to record 753 in the affidavit at that location, paragraph 62 of that affidavit at record 753 where estoppel was raised. As one reads the opposing brief, most of the opposing brief says nothing was raised in the court below. Unless you ask otherwise, I intend to draw this down into pages and this is there and this is here because we do that in our reply brief. And I'll defer to those issues with regard to arguments below, issues below to that brief to your attention. Are there other questions for me? Thank you very much. Thank you all. The court will come down, read counsel and adjourn court for the session. This honorable court stands adjourned. Sign and die. God save the United States and this honorable court.
judges: James A. Wynn Jr., A. Marvin Quattlebaum Jr., Allison J. Rushing